FILED
2026 Jun-12 AM 09:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOHN MELENDEZ,<br><br>Plaintiff,<br><br>-against-<br><br>KARL HEBERGER, SHAULI EGAR (aka "SHULI EGAR"), THE SHULI NETWORK, WHO ARE THESE PODCASTS<br><br>Defendants. | Index No. 160416/2025<br><br>(Hon. )<br><br>**AMENDED COMPLAINT** |

Plaintiff John Melendez ("**JM**"), by and through its counsel Benedict Advisors, as and for its Complaint against Defendants Karl Heberger ("**KH**"), Shauli Egar (aka "Shuli Egar") ("**SH**"), and "The Shuli Network" ("**TSN**") and "Who Are These Podcasts ("**WATP**" and, collectively with KH, SH, and TSN, the "**Defendants**") alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff John Melendez brings this action to stop and redress Defendants' willful and unauthorized commercial exploitation of Plaintiff's name, image, likeness, voice, and persona.

2. Over the course of 2024 and 2025, Defendants have repeatedly misappropriated Melendez's identity for profit through online broadcasts, ticketed live events, Pay-Per-Views, and promotional content on YouTube and other platforms – all without Plaintiff's consent.

3. Plaintiff brings this action for violations of his statutory right of publicity under New York Civil Rights Law §§ 50 and 51, as well as related claims under New York common law, arising from Defendants' deliberate misuse of his persona.

4. Between June 2024 and the present day, Defendants engaged in a continuous scheme to monetize Plaintiff's fame and reputation. They did so by, inter alia, broadcasting surreptitiously recorded audio of Plaintiff on their online shows, incorporating Plaintiff's name, likeness, and images in promotional materials and merchandise, and hosting paid events explicitly marketed on the appeal of hearing and seeing Plaintiff (without his involvement or permission).

5. For example, Defendants organized two pay-for-entry events – "DabbleCon 2" that took place at a venue in Rochester, NY, in mid-August 2024 and "Dabble House" in April 2025 (a pay-per-view event) – which they advertised using Plaintiff's identity (including his photograph and recognizable voice recordings) as the main attraction to draw audiences and sell tickets. In the lead-up to these events, Defendants aired numerous live-stream programs on "The Shuli Network" YouTube channel featuring Plaintiff's name and likeness, and even played clips of Plaintiff's recorded voice, all the while collecting paid "Superchat" donations and other revenue from viewers, many of whom reside in New York State and New York City.

6. Defendants have gone so far as to exploit Plaintiff's personal property and memorabilia for commercial gain – stealing discarded items from Plaintiff's trash (such as sofa cushions from his Los Angeles home) and displaying them as props at events to attract attention – demonstrating an extraordinary willful disregard of Plaintiff's rights.

7. Lack of Consent and Warnings Ignored: At no point has Plaintiff consented to Defendants' use of his name, image, voice, or any other aspect of his persona. On the contrary, when Plaintiff learned of Defendants' plans and conduct, he took active steps to stop them. In June 2024, through his counsel, Plaintiff sent multiple cease-and-desist letters to Defendants Egar and Heberger demanding that they cease their unlawful uses of his recorded voice and likeness. These letters also

admonished Defendants for making extortionate threats – specifically, Defendants had threatened to release embarrassing recorded conversations of Plaintiff unless he acquiesced to their demands, including a demand that the Plaintiff admit to crimes that he did not commit, which Plaintiff's counsel noted was illegal and actionable. Plaintiff additionally filed reports with law enforcement (including the FBI and the Los Angeles Police Department) regarding the illegally recorded phone calls that Defendants were exploiting.

8. Despite these clear warnings and demands, Defendants ignored them and continued, and even escalated, their exploitation and unauthorized commercial use of Plaintiff's identity. Defendants brazenly pressed on with the DabbleCon 2 event and related promotions, and thereafter continued to publicize Plaintiff's persona for profit, willfully flouting Plaintiff's rights.

9. Injuries and Relief Sought: Defendants' unauthorized uses of Melendez's persona have caused significant injury to Plaintiff. They have usurped Plaintiff's sole right to control the commercial use of his identity, inflicted emotional distress and humiliation by subjecting him to public ridicule for profit, and deprived him of the ability to monetize his own name and likeness. Defendants have unjustly enriched themselves by trading on Plaintiff's reputation and fame – pocketing money from event ticket sales, online "superchat" donations, and related merchandise – all at Plaintiff's expense.

10. Plaintiff therefore seeks a permanent injunction to stop Defendants from any further use of his name, image, likeness, voice, or persona without consent. Plaintiff also seeks monetary relief, including compensatory damages of no less than $300,000 to compensate for his injuries and Defendants' profits derived from the misappropriation, and exemplary (punitive) damages of $300,000 to punish and deter Defendants' knowing, egregious conduct. Plaintiff further seeks reasonable attorney fees, costs, and any other relief the Court deems just and proper.

**PARTIES**

11. Plaintiff John Melendez is an individual residing in Florida. Melendez is a nationally known comedian and media personality, famously known by the moniker "Stuttering John" from his years on The Howard Stern Show as well as for being an Announcer on The Tonight Show with Jay Leno, and other entertainment ventures. Mr. Melendez has cultivated a distinctive persona, and his name, voice, and likeness possess significant commercial value. At all relevant times, Melendez did not authorize Defendants to use his identity for any purpose.

12. Upon information and belief, Defendant Karl Heberger is an individual residing in the State of New York. Heberger is a content creator and event promoter who has worked in concert with Defendant Egar to produce online shows and live events under the banner of WATP and TSN, Heberger played a pivotal role in planning and hosting the events and broadcasts at issue, including DabbleCon 2 and Dabble House. He directly participated in the unauthorized use of Plaintiff's name, likeness, and voice during those events and promotions. Heberger has openly been the face of Who Are These Podcasts that profited from exploiting Plaintiff's persona.

13. Upon information and belief, Defendant Shauli Egar is an individual residing in the State of Alabama. Egar is a comedian and online broadcaster, and the owner and operator of the YouTube-based media platform, or tradename, known as "The Shuli Network." Egar formerly worked in New York as a radio personality and has a nationwide following. In the events described herein, Egar served as a host and organizer, frequently on-camera, and was primarily responsible for broadcasting Plaintiff's recorded voice and image on The Shuli Network programs. Egar and Heberger acted in close concert to execute the schemes alleged, and Egar has openly been the face of The Shuli Network that

profited from exploiting Plaintiff's persona.

14. Defendant "The Shuli Network" (TSN) is, on information and belief, an entity or alter ego through which Egar (with Heberger's assistance) carries out his online content business. TSN is believed to be an unincorporated association, d/b/a, or similarly structured enterprise (possibly just an unregistered tradename owned by sole proprietor Mr. Egar) with its principal place of business likely in Alabama, but along with Mr. Heberger and Mr. Egar, earning revenue from viewers or ticket buyers in NYS and New York City. The Defendants, including TSN, operate monetized YouTube channels and related social media accounts that publish shows, streams, and advertisements. Throughout 2024-2025, TSN was a vehicle by which Egar and Heberger monetized the unauthorized uses of Melendez's name, likeness, and voice. TSN is thus named as a Defendant to ensure full relief can be granted, including injunctive relief against the ongoing operations that misuse Plaintiff's persona.

15. Defendant "Who Are These Podcasts" ("WATP") is, on information and belief, an entity or alter ego through which Heberger (with Egar's assistance) carries out his online content business. WATP is believed to be an unincorporated association, d/b/a, or similarly structured enterprise (possibly just an unregistered tradename owned by sole proprietor Mr. Heberger) with its principal place of business likely in Rochester, NY or Alabama, but along with Mr. Heberger and Mr. Egar, earning revenue from viewers or ticket buyers in NYS and New York City. The Defendants, including WATP, operate monetized YouTube channels and related social media accounts that publish shows, streams, and advertisements. Throughout 2024-2025, WATP was a vehicle by which Egar and Heberger monetized the unauthorized uses of Melendez's name, likeness, and voice. WATP is thus named as a Defendant to ensure full relief can be granted, including injunctive relief against the ongoing operations that misuse Plaintiff's persona.

16. Collective Allegations: At all relevant times, each Defendant acted individually and in concert with the others with respect to the acts complained of. Defendants Egar and Heberger directly managed and controlled TSN's and WATP's content and events. All Defendants shared in the profits derived from the wrongful conduct. Accordingly, Defendants are jointly and severally liable for the torts and statutory violations described below.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over this action. Plaintiff's claims arise under New York State law, including the New York Civil Rights Law §§ 50 and 51 (right of privacy/publicity statute) and New York common law. Plaintiff seeks damages above the jurisdictional minimum of all lower courts, including a demand of $600,000 in total damages (exclusive of interest, costs, reasonable attorney fees, etc.). Therefore, the Supreme Court of the State of New York has jurisdiction to adjudicate these claims and grant the relief requested.

18. This Court has personal jurisdiction over each of the Defendants under New York's long-arm statute (CPLR § 302). Defendants committed tortious acts within the State of New York and directed toward New York, which give rise to the claims herein. In particular, Defendants organized, promoted, and carried out the DabbleCon 2 event in Rochester, New York in mid-August 2024, where Plaintiff's likeness and voice were exploited before a paying New York audience and via Pay-Per-View. Defendants also regularly transmit and broadcast infringing content into New York via the internet (YouTube and other platforms), solicit donations and sell event tickets to New York residents, and otherwise transact business in New York through their media operations. The injuries to Plaintiff's rights have occurred, in substantial part, in New York, where Defendants' unauthorized commercial use of his persona has been exhibited and monetized.

19. Upon information and belief, Defendant Heberger is a resident of New York State and Defendant Egar has conducted significant business in New York (including the acts at issue). Additionally, upon information and belief, one or more of the Defendants process payments or receive money for the conduct at issue here through one or more New York State-based merchant banking accounts. By these contacts and actions, each Defendant has purposefully availed himself or itself of the laws of New York and should reasonably anticipate being hauled into a New York court to answer for the conduct alleged.

20. Venue is proper in New York County pursuant to CPLR § 503(a). Plaintiff designates New York County as the place of trial. Plaintiff is not a New York resident. Although Defendant Karl Heberger resides in New York State (Monroe County), CPLR § 503(a) permits laying venue in a county where a substantial part of the events or omissions giving rise to the claim occurred. Plaintiff has accordingly chosen New York County because a substantial portion of the events and harms giving rise to the claims occurred in this County and the greater New York City area. TSN's content was widely published and viewable in New York County, and the commercial impact of Defendants' misconduct was felt in this County, where Plaintiff's professional reputation and business opportunities in the entertainment industry (centered in New York City) have been harmed. The venue in New York County will also serve the convenience of witnesses and the ends of justice.

## FACTUAL ALLEGATIONS

21. Plaintiff John Melendez is a well-known figure in comedy and broadcasting, with a distinctive voice and persona that he has cultivated over decades.

22. By virtue of his public career, Melendez's name and likeness carry significant fame and goodwill among audiences.

23. Defendants are not as well-known commentators and content producers operating in the same realm of entertainment and have frequently targeted Melendez as a subject of discussion on their shows.

24. Realizing that Melendez's mere presence -- even unauthorized and in some cases falsely implying to casual viewers participation -- drew substantial audience attention, Defendants seized upon an illicit opportunity to generate content and revenue by incorporating Melendez into their programming – without ever seeking or obtaining his permission.

25. As detailed below, Defendants obtained illegally recorded private phone calls of Melendez. They systematically used those recordings, along with Melendez's image and other personal material, as the centerpiece of their commercial ventures from mid-2024 onward. Defendants' actions were not isolated incidents; they formed part of a deliberate, ongoing effort to capitalize on Melendez's celebrity at the expense of his legal rights.

26. Upon information and belief, this illicit use of Plaintiff's unauthorized image, likeness, or AI-modified voice became an important part of the Defendant's business, possibly bringing in a material percentage of their gross revenue for 2024- present day.

27. In or around June 2024, Defendant Shuli Egar procured confidential telephone conversations of Plaintiff through unlawful means.

28. Upon information and belief, Egar enlisted a third party, Kate Meaney, who was an acquaintance of Plaintiff, to record her private calls with Plaintiff surreptitiously.

29. These calls took place while Plaintiff was in California, a state that requires the consent of all parties to record a phone call.

30. Plaintiff never consented to any such recordings.

31. Ms. Meaney's recording of the calls was illegal under California law.

32. Upon information and belief, Egar induced Ms. Meaney to commit this act by exploiting a personal situation: Egar had been publicly ridiculing Ms. Meaney on his shows, and he promised to cease the harassment if she provided him with recorded conversations with Melendez.

33. Upon information and belief, under this pressure, Ms. Meaney covertly recorded multiple phone calls with Plaintiff and then delivered the audio files to Egar (and, by extension, to Heberger). These recordings contained Plaintiff's voice and personal statements, captured without his knowledge.

34. Defendant Karl Heberger, acting in concert with Egar, knew or should have known that these recordings were obtained unlawfully, yet both Egar and Heberger chose to use them for their own ends.

35. By early Summer 2024, Defendants Egar and Heberger were in the process of organizing a fan convention and comedy event they titled "DabbleCon 2." This event was scheduled for August 16–17, 2024 at the Carlson Comedy Club in Rochester, New York.

36. The event was a sequel to a prior "DabbleCon" and was aimed at the community of online listeners who "dabble" in commentary about various internet personalities – with Plaintiff Melendez being a primary subject of interest.

37. In the weeks leading up to DabbleCon 2, Defendants embarked on an aggressive promotional campaign that revolved around Plaintiff's persona.

38. Defendants repeatedly advertised, using Plaintiff's image, likeness, voice, and persona, that DabbleCon 2 would feature exclusive content of Melendez – namely, that attendees would hear portions of the secret phone call recordings of Melendez which Defendants had obtained.

39. This was a major selling point for the event; Defendants knew that their audience was eager to hear Melendez's candid, private conversations, especially given the illicit and sensational manner in which those tapes were procured.

40. To generate buzz (and revenue) before the event, Defendants used their YouTube channel The Shuli Network and WATP to host multiple live-streamed video programs discussing Plaintiff and the leaked calls.

41. For example, on or about June 19, 2024, The Shuli Network aired a members-only stream entitled "John & Kate Plus HATE."

42. This program's title used Plaintiff's name and referenced his voice and persona in connection with Kate Meaney.

43. The thumbnail image displayed to viewers for this video prominently featured Plaintiff's photograph, making Melendez's image the "face" of the show. During the stream, Defendants (and/or their co-hosts) played excerpts of the illicit recordings of Plaintiff's voice. They analyzed and mocked the content of these calls on air, all while encouraging viewers to donate money via YouTube's "Superchat" function to support the channel.

44. Similarly, on or about June 22, 2024, Defendants broadcast an "Emergency Show" on The Shuli Network focusing on "John and Kate" – again referring to Plaintiff and Ms. Meaney – as a promotional hype stream for DabbleCon 2.

45. In these broadcasts, Defendants not only derived direct monetary gain from viewer donations, but they explicitly plugged the upcoming DabbleCon 2 event, urging fans to buy tickets or pay-per-view access if they wanted to "hear it all." Defendants were using Plaintiff's name, image (in promotional graphics), and voice (via the recordings) to advertise their event and drive ticket sales.

46. Upon learning of Defendants' activities in June 2024, Plaintiff Melendez swiftly attempted to halt the misuse of his persona.

47. Through his attorneys, Plaintiff sent formal cease-and-desist letters to Defendants.

48. On or about June 7, 2024, Plaintiff's counsel (Parker Stanbury LLP) notified Egar and Heberger in writing of their unlawful conduct, accusing them of slander, extortion, and invasion of privacy. The letter demanded that Defendants immediately cease playing or disseminating the recorded calls and refrain from any further harassing commentary or threats.

49. It referenced Defendants' own statements implying that unless Plaintiff "admitted" to certain allegations, Defendants would release the tapes – conduct which Plaintiff's counsel identified as extortionate. It was or should have been clear to defendants that the use of our client's name, image, likeness, video, and persona to sell tickets and generate revenue was unauthorized.

50. A follow-up letter on or about late June 2024, reiterated these demands and clarified that Plaintiff would pursue all available legal remedies if Defendants did not comply.

51. Additionally, Plaintiff Melendez filed reports with law enforcement authorities concerning the unlawful recording and use of his conversations.

52. Plaintiff lodged a complaint with the FBI and with the Los Angeles Police Department

in June 2024, identifying Kate Meaney, Shuli Egar, and Karl Heberger as parties involved in the illegal taping and exploitation of his calls.

53. These actions by Plaintiff put Defendants on explicit notice that their conduct was unauthorized, illegal, and highly objectionable. Defendants, however, failed to heed these warnings.

54. Defendants proceeded to hold the DabbleCon 2 event as planned on August 16 and 17, 2024, in Rochester, New York – over Plaintiff's objections.

55. The event was a ticketed gathering of fans, held at a commercial venue (the Carlson Comedy Club), where Defendants Egar and Heberger (along with associates) performed and presented material to a live audience – the primary draw not being their commentary but Plaintiff's name, likeness, and illegally recorded voice.

56. Plaintiff's name, likeness, and recorded voice were exploited at this event to drive attendance and entertainment.

57. In the lead-up advertising for DabbleCon 2, Defendants had repeatedly invoked Melendez's persona – for example, online flyers and posts for the event included caricatures, cartoons, or photos of "Stuttering John," and promotions promised that attendees would get to hear unreleased audio of Melendez.

58. At the event itself, Defendants made good on that promise: they played the secret recordings of Plaintiff in their entirety for the audience. This was done to engage the crowd at Plaintiff's expense and as a climactic "highlight" of the show, all of which made the Defendants money.

59. Upon information and belief, the audience at DabbleCon 2 was eagerly anticipating

hearing Plaintiff's voice on the tapes – at one point the crowd chanted "We want the tapes!" until Defendants played them.

60. The spectacle of broadcasting Plaintiff's private conversations was a headline feature of DabbleCon 2, far overshadowing any original content Defendants provided.

61. Attendees effectively paid for the unauthorized "Stuttering John content." Defendants capitalized on Plaintiff's fame to sell out the venue and enhance their own standing in the community of listeners. Notably, Plaintiff himself was not present (nor even aware of precisely what would occur), yet his identity effectively headlined the event without his consent.

62. In a further egregious twist, Defendants incorporated actual personal property of Plaintiff into DabbleCon 2's attractions.

63. Upon information and belief, individuals acting at Defendants' direction (or Defendants themselves) trespassed upon or otherwise intruded into Plaintiff's residential premises in Los Angeles to obtain discarded items belonging to Plaintiff.

64. Specifically, they retrieved several sofa cushions from Plaintiff's trash after Plaintiff had disposed of an old couch.

65. The cushions, recognizable to those familiar with Plaintiff's home studio from online broadcasts, were then transported to Rochester and presented at the DabbleCon 2 event as a comedic exhibit.

66. Defendants put the used cushions on display for attendees to photograph and joke about – essentially treating Plaintiff's discarded trash as a trophy. The stunt was clearly intended to ridicule

Plaintiff and to further entice fans by offering a bizarrely intimate connection to him (literally, pieces of his home).

67. Plaintiff never authorized anyone to take his discarded property for any purpose. By exploiting these items in a commercial setting, Defendants flagrantly violated Plaintiff's privacy and property rights, underscoring the lengths to which they would go to profit from Plaintiff's persona.

68. After DabbleCon 2 concluded, Defendants continued to breach Plaintiff's rights under New York state law. Defendants did not relent in using Melendez's name and likeness to generate content and income.

69. In the weeks and months following the mid-August 2024 event, TSN channel continued to produce online shows focusing on Plaintiff.

70. For instance, on or about August 24, 2024, Defendants broadcast a live show titled "Stuttering John Gets CREEPY." This program was conducted before a live online audience (and possibly a live in-studio audience as well).

71. As with prior streams, Defendants used Plaintiff's image in the thumbnail and promotional materials for the show to attract viewers and generate revenue.

72. During the August 24 stream and others in that period, Defendants repeatedly referenced the events of DabbleCon 2 and played or discussed portions of the recordings of Plaintiff that had been featured there.

73. They also used these streams to promote upcoming projects – teasing that more material involving "Stuttering John" would be coming soon, thereby encouraging their audience to stay tuned

and continue contributing money.

74. Each time Defendants thus invoked Plaintiff, they solicited and received more Superchat donations, elevating their channel's revenue. In short, Defendants treated the DabbleCon 2 event and its trove of illicit recordings as content that could be endlessly monetized on TSN and WATP.

75. As 2024 drew to a close, Defendants sought to obtain even more unauthorized material featuring Plaintiff to fuel their commercial endeavors.

76. Upon information and belief, in December 2024 Defendant Egar again contacted Kate Meaney to coax her into recording Plaintiff without his consent.

77. Upon Information and belief, despite Ms. Meaney's prior assurances to Plaintiff that she would never tape him again (and her apparent remorse for the first incident), Egar induced her to surreptitiously record Plaintiff a second time.

78. Upon Information and belief, Egar threatened Ms. Meaney that if she did not help him record new conversations with Plaintiff, he would publicly spread false rumors that Ms. Meaney had a romantic relationship with Plaintiff.

79. Upon Information and belief, under this coercion, Ms. Meaney once more unlawfully recorded one or more phone calls with Plaintiff in or around late 2024. These new audio recordings – again containing Plaintiff's voice and personal communications without his knowledge or consent– were turned over to Defendants Egar and Heberger. Consequently, by the start of 2025, Defendants had in their possession a "new batch" of stolen audio of Melendez, which they fully intended to exploit as they had done with the earlier tapes.

80. Armed with fresh illicit content, Defendants moved forward with plans for another major paid event centered on Plaintiff.

81. In early 2025, Egar and Heberger announced an event titled "Dabble House."

82. The name itself was an allusion to Plaintiff (playing on his well-known nickname, "Stuttering John," and a trope in the community about "dabbling" in John-related content).

83. In February 2024, The Shuli Network started playing the original unlawfully obtained recordings of Mr. Melendez and Kate Meany, referring to the shows as "TAPEUARY", to promote the acquisition of new recordings and the upcoming Dabble House.

84. Dabble House was conceived as a pay-per-view streaming event (with a possible limited in-person component) to be held on April 11–12, 2025.

85. Unlike DabbleCon 2, which was a traditional comedy club gathering, Dabble House was primarily an online pay-to-access show broadcast from a studio in Florida.

86. Defendants offered fans the ability to purchase virtual "tickets" or streaming passes to watch the event live online.

87. As before, the central draw advertised for Dabble House was the promise of hearing new, never-before-heard recordings of the Plaintiff.

88. In promotions leading up to April 2025, Defendants hinted that they had sensational new audio of "Stuttering John" (referring to the December 2024 tapes) and that these would be showcased during the Dabble House pay-per-view.

89. Defendants used Plaintiff's name and likeness in advertising this event on social media

and YouTube, generating excitement among their subscriber bases.

90. Upon information and belief, the proceeds from pay-per-view sales for Dabble House were funneled through one of the Defendants' payment accounts in New York (indicating that revenue from this Florida-based event flowed back into New York).

91. The scheme was essentially a repeat of DabbleCon 2's formula: entice the audience with stolen John Melendez content, charge admission, and reap the profits. This unauthorized use of Plaintiff's name, image, likeness, audio, video, and persona was a model Defendants repeatedly used, seemingly as an integral part of their business model. Upon information and belief, this model was one of the more profitable parts of their business, but only possible via defendants breaking New York State law.

92. In furtherance of promoting Dabble House (and capitalizing on the new recordings in hand), Defendants again turned to obsessively discussing Plaintiff again.

93. On or about January 24, 2025, Defendants broadcast an episode of one of their recurring shows (colloquially known as the "Uncle Rico" show, which is largely devoted to discussing and mocking Plaintiff) with the title: "The (First) Time Stuttering John Was PLAYED By Kate Meaney."

94. This episode title explicitly references the saga of Ms. Meaney deceiving Plaintiff to record him.

95. During the show, Defendants played video clips and/or audio depicting Plaintiff and recounted how Ms. Meaney had "played" him – essentially previewing the narrative behind the upcoming Dabble House content. It was more unauthorized, commercial use, using a proven model for increasing revenue, unfortunately in contravention of NYS law.

96. They again used Plaintiff's name ("Stuttering John") prominently to draw viewers.

97. By streaming this in January, Defendants kept their audience engaged and primed them to purchase the pay-per-view event in April.

98. All the while, Defendants continued to derive ongoing YouTube advertising revenue and Superchat donations due to the increased viewership whenever Plaintiff was the topic.

99. The Dabble House pay-per-view event took place on April 11 and 12, 2025, as scheduled. Though physically produced in Florida, it was broadcast live to paying customers worldwide (including many in New York).

100. During this two-day event, Defendants once again exploited Plaintiff's persona as the main entertainment. They played significant portions of the December 2024 secret recordings of Plaintiff for the audience, interspersing these with their own commentary and comedy segments. Defendants Egar and Heberger, acting as hosts, derived humor and content directly from Plaintiff's words and voice on those tapes, and again – by unauthorized commercial use, generating more revenue.

101. As with DabbleCon 2, Defendants used visual elements referencing Plaintiff (such as displaying his photos or caricatures or wearing attire that invoked his image or trademarks) to enhance the show's appeal.

102. Once again, viewers paid to witness this unauthorized exhibition of Melendez's private moments. By the conclusion of Dabble House, Defendants had further lined their pockets with profits earned off Plaintiff's name and likeness, without having paid Plaintiff a cent or obtained his permission.

103. By May 2025, Defendants' ongoing exploitation of John Melendez had become so

notorious that even outside observers began commenting on the likely illegality of their conduct.

104. On or about May 9, 2025, an internet-based legal commentary program called "Lazy Law News Network" featured a segment discussing Plaintiff Melendez's situation and his rights of publicity. In that broadcast (available on YouTube), legal analysts outlined how Defendants' use of Melendez's voice and image without consent likely violated New York's publicity rights law. The Supreme Court's recent decision in Andy Warhol Foundation v. Goldsmith (2023) – a case dealing with fair use in the context of image appropriation – was analyzed (noting that Defendants might attempt to invoke "fair use" or First Amendment defenses for their actions, but that such defenses would be weak given the primarily *commercial* nature of Defendants' use and the lack of any true transformative commentary).

105. This public discussion underscored that Defendants' conduct was not only well-known but widely perceived as unlawful. Defendants were or should have been aware that their continued course of conduct was legally risky and breached NYS law, yet they persisted, nonetheless.

106. In light of Defendants' unabated misappropriation of his persona, Plaintiff engaged undersigned counsel to pursue legal action.

107. On May 14, 2025, Plaintiff formally retained the law firm of Benedict Advisors to address this matter.

108. On May 30, 2025, Plaintiff's counsel sent a comprehensive demand letter to Defendants Egar and Heberger. This letter detailed Defendants' numerous violations of Plaintiff's rights (including breaches of New York Civil Rights Law §§ 50–51) and demanded that Defendants immediately cease and desist from any further use of Melendez's name, likeness, voice, or any other indicia of his identity.

109. The letter also demanded that Defendants provide an accounting and compensation for the profits they had made from their past unlawful uses and warned that Plaintiff would file a lawsuit if a satisfactory response was not received by a specified deadline (June 13, 2025).

110. On June 13, 2025, Defendants (through an email sent by either Egar or Heberger) replied to Plaintiff's counsel. In their response, Defendants refused to comply with the demands.

111. In the email, Defendants attempted to justify or excuse their actions by advancing certain "legal arguments," which, upon information and belief, included referencing First Amendment or "fair use" principles and disputing Plaintiff's claims of unlawful use.

112. Defendants' self-justifications were unfounded, as they ignored the clear dictates of New York law prohibiting what they had done and to this day are continuing to do.

113. Plaintiff's counsel emailed back on the same day, asking Defendants whether they were represented by legal counsel to whom further communications should be directed. Defendants failed to answer that inquiry or otherwise indicate any intention of ceasing their activities.

114. As of early August 2025, Defendants still had not engaged counsel or meaningfully addressed Plaintiff's grievances. Instead, they continued to operate The Shuli Network and retain the benefits gained from their unlawful exploitation of Plaintiff.

115. At all times relevant, Defendants acted knowingly, willfully, and in conscious disregard of Plaintiff's rights. Defendants were explicitly informed – via Plaintiff's letters, letters from attorneys, and police reports – that their conduct was unauthorized and unlawful, yet they chose to ignore these notices.

116. Defendants continued to misuse Plaintiff's voice and likeness even after being warned by counsel and even after public commentary highlighted the legal violations.

117. Defendants' actions were not accidental or inadvertent; they were part of a deliberate strategy to draw viewers and revenue by trading on the fame and notoriety of "Stuttering John."

118. Defendants also acted with actual malice and intent to harm, insofar as they sought not only to profit from Plaintiff's fame but also to embarrass and harass him.

119. This is evidenced by tactics such as extorting a friend of Plaintiff to betray him, displaying Plaintiff's personal trash to ridicule him, and repeatedly taunting Plaintiff on air.

120. Defendants have demonstrated that absent judicial intervention, they will continue to unlawfully exploit Plaintiff's persona as long as it is profitable for them to do so.

121. Defendants' use of Plaintiff's name, likeness, and voice was and is purely for commercial purposes and falls outside any possible legal exceptions or privileges. Plaintiff is a private individual when it comes to the contexts Defendants exploited – the content in question was not news reporting nor commentary on a matter of public concern, but rather salacious entertainment and promotion designed to enrich Defendants.

122. Even to the extent Defendants interwove some "commentary" or parody in their shows, such elements were built entirely on unauthorized reproductions of Plaintiff's persona and are not transformative; Defendants simply appropriated Plaintiff's expressions and identity as the raw material of their revenue-generating content.

123. Nothing about Defendants' conduct constitutes fair use, bona fide news coverage, or any

other protected use under the law. In short, no consent was given by Plaintiff, and no legal justification excuses Defendants' rampant commercial misappropriation of Plaintiff's rights.

**COUNT I – UNAUTHORIZED COMMERCIAL USE OF NAME, IMAGE, LIKENESS, AND VOICE**
***(Violation of N.Y. Civil Rights Law §§ 50 and 51)***

124. Plaintiff repeats and restates the foregoing allegations.

125. New York Civil Rights Law § 50 prohibits the non-consensual use of a living person's "name, portrait, picture or voice" for advertising or trade purposes. Section 51 of the Civil Rights Law provides that any person whose name, portrait, picture or voice is used within the state of New York for such purposes without written consent may maintain an action for injunctive relief and damages. Section 51 further provides that if a defendant knowingly uses a person's name, portrait, picture or voice in violation of the law, the trier of fact may award exemplary damages. These statutes codify an individual's "right of publicity" (sometimes referred to as a right of privacy) in New York, making it unlawful to commercially exploit a person's identity without permission.

126. Defendants have used Plaintiff John Melendez's name, portrait/picture (image), and voice, within the State of New York, for advertising purposes and/or for purposes of trade, without Plaintiff's written consent. Defendants' actions described above – including but not limited to (a) using Plaintiff's name and photograph in promotional materials and online video thumbnails to attract viewers to The Shuli Network and Who Are These Podcasts broadcasts and to sell tickets to events, (b) using Plaintiff's voice by playing recorded audio of him during broadcasts and live shows as entertainment content to drive Defendants' revenue, and (c) theming entire commercial events (DabbleCon 2 and Dabble House) around Plaintiff's persona – all constitute use of Plaintiff's name, likeness, and voice for Defendants' own advertising and trade purposes. These uses were intended to, and did, promote

Defendants' business ventures (their networks, shows, and events) and yielded direct commercial benefits to Defendants (including ticket sales, viewer donations, increased channel subscribers, and related merchandise sales).

127. At no time did Plaintiff Melendez give permission, authorization, or consent – written or otherwise – for Defendants to use his name, image, likeness, voice, or persona in any way. Plaintiff is not affiliated with The Shuli Network nor the Who Are These Podcasts, and he did not endorse DabbleCon 2, Dabble House, or any other program or product that Defendants offered. On the contrary, Plaintiff unequivocally objected to Defendants' conduct, as evidenced by the cease-and-desist notices and complaints he lodged. Defendants thus had actual knowledge that they lacked consent yet continued their activities. Moreover, a substantial portion of Defendants' unauthorized uses occurred "within this state," as required under Civil Rights Law § 51. Defendants promoted and held the DabbleCon 2 event in New York, and they disseminated promotional materials and online content featuring Plaintiff statewide (and worldwide). The infringing YouTube broadcasts were accessible in New York and in fact targeted New York audiences (including New York City–based viewers) as part of Defendants' market. Additionally, Defendants transacted business in New York related to these uses (for example, processing ticket revenue through New York accounts, as alleged). Accordingly, the statutory requirement of use "within this state" is satisfied for each Defendant.

128. Defendants' misappropriation of Plaintiff's name, image, likeness, and voice has caused injury to Plaintiff's peace of mind, dignity, and professional reputation, and has resulted in economic loss. Plaintiff has suffered humiliation, stress, and anguish from being held up to scorn and ridicule in front of large audiences without his consent. He has also been forced to expend time and resources to protect his rights and mitigate damage to his career. Moreover, Defendants have unjustly profited from the use of Plaintiff's persona – money that rightfully should belong to Plaintiff or should not have been

earned at all. These injuries are the direct and proximate result of Defendants' unlawful actions. Defendants' conduct was committed knowingly and willfully, in conscious disregard of Plaintiff's rights. As detailed above, Defendants persisted after receiving cease-and-desist letters and knowing full well that their acts were wrongful. The evidence shows a calculated effort to exploit Plaintiff's identity over an extended period for monetary gain. Accordingly, under Civil Rights Law § 51, Plaintiff is entitled not only to compensatory damages for his injuries but also to exemplary (punitive) damages to punish Defendants and to deter such conduct. Defendants' willful and wanton misconduct justifies an award of punitive damages in this case.

129. Defendants' use of Plaintiff's name, image, and voice does not fall under any statutory or judicial exception to liability. The use was not part of any news broadcast or report on a matter of public interest, nor was it a protected parody or satire; rather, it was purely commercial entertainment and self-promotion. The use was also not "incidental" or de minimis – Plaintiff's identity was central to Defendants' product. Therefore, Defendants cannot avail themselves of any defense or privilege (such as newsworthiness, public concern, or comedy/parody) that would exempt their conduct from liability under §§ 50–51.

130. By reason of the foregoing, Defendants are liable to Plaintiff for violating New York Civil Rights Law §§ 50 and 51.

131. Plaintiff seeks (a) an injunction permanently enjoining Defendants from any further unauthorized use of his name, portrait, picture, voice, or persona, and ordering them to remove or take down any existing content in their possession or control that contains such unauthorized use; (b) an award of actual damages in an amount to be determined at trial, but believed to be not less than $300,000, to compensate Plaintiff for the harm and losses described above; and (c) an award of

exemplary (punitive) damages in the amount of $300,000 (or such greater amount as the Court finds appropriate) due to the willful and wanton nature of Defendants' violation.

**COUNT II – COMMON LAW MISAPPROPRIAZTION OF RIGHT OF PUBLICITY**
*(Commercial Misappropriation of Name and Likeness – Unfair Competition)*

132. Plaintiff repeats and restates the foregoing allegations.

133. Plaintiff pleads this cause of action in the alternative to **Count I** to the extent any element of relief sought may not be fully available under the statutory claim.

134. At common law, it is a wrongful act to misappropriate for one's own benefit the valuable property rights of another. Plaintiff Melendez's name, likeness, voice, and persona have significant commercial value, as they are key aspects of his identity that he has developed and that have monetary worth in the entertainment industry. By engaging in the conduct described above – taking Plaintiff's identifiable persona (through his image and voice) and using it as the basis for their own content, shows, and events – Defendants have misappropriated the commercial value of Plaintiff's identity. They did so with the intent to reap where they have not sown, effectively hijacking Plaintiff's reputation and goodwill to draw attention and revenue to their own ventures.

135. Defendants' misappropriation was unauthorized and in bad faith.

136. Plaintiff never gave permission for Defendants to exploit his persona.

137. Defendants' actions were undertaken for competitive and commercial advantage: Plaintiff Melendez earns his living through his performances, appearances, and his persona in media.

138. Defendants, by appropriating his persona without permission, essentially set themselves up as an unauthorized alternative source of "Stuttering John" content.

139. This usurped a potential market, especially in the largest market, NYC and NYC Metro (including NY Suburbs) that rightfully belongs to Plaintiff. If anyone were to profit from pay-per-view events or media derived from Melendez's personal life, it should have been Melendez himself – not Defendants.

140. Defendants' actions thus caused competitive injury to Plaintiff by siphoning off opportunities and by saturating the market with unauthorized content featuring Plaintiff, thereby diminishing the value of Plaintiff's own brand and potential official projects.

141. Defendants' conduct constitutes a form of unfair competition under New York common law. It was a bad-faith misappropriation of the labors and expenditures of another for Defendants' own profit. Plaintiff's "labor and expenditure" in this context is his cultivation of a persona and public image over years of work in entertainment, which Defendants exploited without having invested in it or obtained the rights to it. Defendants acted with deceit and subterfuge (obtaining secret recordings, etc.) and with the intent to capitalize on Plaintiff's efforts and fame.

142. This is precisely the sort of unethical and unfair business practice that common law misappropriation claims are designed to remedy.

143. As a direct and proximate result of Defendants' misappropriation of Plaintiff's name and likeness, Plaintiff has suffered damages including the loss of income or licensing fees that could have been earned from legitimate use of his persona, damage to his goodwill, and emotional distress. Defendants have derived substantial ill-gotten gains from their wrongdoing – including, but not limited to, revenues from event tickets, online monetization (viewer donations, advertising revenue), and increased enterprise value of The Shuli Network brand – all at Plaintiff's expense.

144. Defendants' above-described actions were conducted willfully, maliciously, and with intent to harm Plaintiff's interests, thereby warranting the consideration of punitive damages under common law standards as well.

145. Plaintiff seeks an award of monetary damages in an amount to be proven at trial (including an appropriate measure of Defendants' profits attributable to the misappropriation), for which Defendants are jointly and severally liable. Plaintiff also seeks punitive damages in an amount sufficient to punish Defendants' malicious conduct, and permanent injunctive relief to prevent any continued misappropriation of Plaintiff's persona. This relief is sought to the extent it provides remedies supplemental or additional to those available under the statutory cause of action.

**COUNT III – UNJUST ENRICHMENT**

146. Plaintiff repeats and restates the foregoing allegations.

147. By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff. Defendants obtained monetary benefits and other advantages by using Plaintiff's name, likeness, voice, and persona without permission. Specifically, Defendants have received significant income from viewer donations, advertising revenue, ticket and pay-per-view sales, and perhaps merchandise or sponsorships – all as a direct result of featuring Plaintiff's identity in their content. Those benefits were earned through the unauthorized exploitation of Plaintiff's personal rights and reputation.

148. Under principles of equity and good conscience, Defendants should not be permitted to retain the profits and benefits derived from their wrongful acts.

149. Plaintiff has a superior equitable claim to those proceeds, as they were garnered through

the use of his persona and at great cost to him (including harm to his privacy and reputation).

150. It would be unjust for Defendants to keep what is essentially the value of Plaintiff's publicity rights taken without compensation.

151. Defendants have no legitimate justification for the enrichment they obtained. Their conduct was unauthorized and tortious.

152. Any revenues gained are not the product of Defendants' independent efforts alone, but rather were co-opted from Plaintiff's persona.

153. Plaintiff, on the other hand, received no compensation or benefit for Defendants' use of his identity and, instead, suffered damages. Thus, the retention of those benefits by Defendants would be unjust.

154. Plaintiff seeks restitution and disgorgement of all profits and other benefits unjustly obtained by Defendants from their exploitation of Plaintiff's persona. This includes, but is not limited to, all revenue attributable to the shows, streams, events, or promotions in which Defendants used Plaintiff's name, image, likeness, voice, or persona. The exact amount of such enrichment is to be determined according to proof at trial. Plaintiff also seeks the imposition of a constructive trust upon any such funds or assets, to prevent Defendants from being unjustly enriched further. In addition, Plaintiff seeks any other relief the Court deems just and proper to remedy the unjust enrichment, including reasonable attorney fees, costs, and interest.

**WHEREFORE**, Plaintiff demands entry of a judgment against Defendants:

A. For damages under **Counts I-III**;

B. For an award of reasonable attorneys' fees, costs, and disbursements incurred in

connection with this action, and

C. For such other and further relief as this Court deems just and proper.

Dated: **August 12, 2025**
New York, New York

BENEDICT ADVISORS

By: /s/ Tabber B. Benedict

Tabber B. Benedict
Sagar Sharma (*Of Counsel*)
21 West End Ave
Suite 3008
New York, NY 10023
(917) 570-9352

*Attorneys for Plaintiff John Melendez*