FILED
2026 Sep-04 PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **SHULI EGAR; PHILLIP J. RUSSO, and TSN CORP.,**<br>**Plaintiffs,**<br>**-vs-**<br>**JOHN MELENDEZ,**<br>**Defendant.** | **Civ. No.: 5:26-cv-00949-HDM**<br><br>**ORAL ARGUMENT REQUESTED** |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, TRANSFER, SEVER CLAIMS, AND TO DISMISS OR STRIKE REQUESTED EQUITABLE RELIEF</u>**

Plaintiffs Shuli Egar ("Egar"), Phillip J. Russo ("Russo"), and TSN Corp. ("TSN Corp.") (collectively, Egar, Russo, and TSN Corp. may be referred to as the "Plaintiffs"), hereby oppose the Motion to Dismiss, Transfer, Sever Claims, or Strike (the "Motion," *see* Dkts. 14, 15 (brief in support of the Motion) filed by Defendant John Melendez ("Defendant" or "Melendez"). As grounds for their opposition, Plaintiffs show the Court as follows:

## 1. INTRODUCTION.

This action arises out of Defendant's long crusade to prevent the Plaintiffs from engaging in fair use, as allowed by the Copyright Act, and transforming, criticizing, commenting on, parodying, mocking, and ridiculing Defendant's content. (<u>See</u> First Amended Complaint ("FAC") at paras. 37-82; Counts I and II).

Defendant's crusade is nothing more than an attempt to damage (which he has been successful in doing) Plaintiffs for exercising their First Amendment rights. In fact, Defendant is so committed to his cause that he submitted twenty seven (27) "Takedown Notices" under the Digital Millennium Copyright Act ("DMCA") alleging copyright infringement by the Plaintiffs on their YouTube.com ("YouTube") channel, *The Shuli Network,* and one of the shows that airs thereon, *The Uncle Rico Show*. (Id. at paras. 1, 7; see also Declaration of TSN Corp. (the "TSN Dec.") at paras. 1-3, attached hereto as Exhibit 1). However, and importantly, Defendant has **never** filed a single lawsuit claiming copyright infringement; he simply games the system YouTube has put in place under the DMCA to have Plaintiffs' content removed for a period of weeks at a time.

Defendant knows that each time he submits a Takedown Notice, YouTube **automatically** removes the allegedly infringing content from its platform, as YouTube relies upon his sworn statements that the Takedown Notice is submitted in "good faith." (Id. at paras. 31-36). When Plaintiffs' content is removed from the YouTube platform, Plaintiffs suffer both economic and reputational harm. (Id. at paras. 21, 101; see also TSN Dec. at paras. 4-7).

Plaintiffs were forced to seek the Court's intervention when Defendant, after being given ample opportunity, refused to stop submitting the Takedown Notices to YouTube. (FAC at paras. 78-82, Exhibit 3 to FAC).

Left with no alternative to stop the harm they were suffering, Plaintiffs filed their initial complaint in this matter on June 3, 2026, and their FAC on June 12, 2026. Defendant responded by filing the Motion on July 27, 2026, in which he seeks to dismiss the FAC on various grounds under Federal Rule of Civil Procedure ("FRCP") 12, to dismiss certain allegedly overbroad requests for relief, and to strike immaterial allegations. (Motion, pg. 1). Every one of Defendant's alleged grounds for relief in the Motion fails as set forth herein; thus, the Motion is due to be denied. In the alternative, should the Court believe that the FAC is insufficient in some manner, the Plaintiffs are entitled to at least one opportunity to amend the FAC to cure any insufficiencies the Court identifies, which the Plaintiffs respectfully request. Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir.1988) (a district court's discretion to dismiss a complaint without leave to amend is severely restricted by FRCP 15(a), which directs that leave to amend shall be freely given when justice so requires).

## 2. SUMMARY.

Each of Defendant's arguments in the Motion fails, either as a matter of law, a matter of fact, or both.

First, this Court has jurisdiction over Melendez, as he has sufficient contacts with the State of Alabama to justify the exercise of specific jurisdiction over him regarding this matter. See Ex parte DBI, Inc., 23 So. 3d 635, 644 (Alabama's long-

arm rule consistently has been interpreted to extend the jurisdiction of Alabama courts to the permissible limits of due process. Specifically, Defendant's repeated submission of Takedown Notices to YouTube, in bad faith, which caused both economic and reputational damages to Egar and TSN Corp., both residents of Alabama (see FAC at paras. 11-12, 16-22; TSN Dec. at paras. 4-8), created a substantial connection between Defendant and Alabama to justify this Court exercising personal jurisdiction over him.

Second, venue is proper herein in the Northern District of Alabama. Specifically, venue is proper under both 28 U.S.C. §§ 1391(b)(2) and 1400(a).

Third, there are no grounds that support striking the Defendant's own statements from the FAC. The allegations in question are material to the claims in this case, are not frivolous, and perhaps most importantly, are the Defendant's own statements that he published to the world.

Fourth, the FAC is not a shotgun pleading. As pleaded, and as evidenced in the Motion, the FAC sufficiently informs Defendant what the case is so that he can answer either that is not so, or something else is so. Weiland v. Palm Beach County Sheriff's Office, 792 F. 3d 1313, 1316 (11th Cir. 2015). However, should the Court determine otherwise, Plaintiffs are entitled to an opportunity to replead the complaint.

Fifth, Counts I (Violation of the DMCA) and Count II (Declaratory Judgment

of Non-Infringement) are sufficiently pleaded. In particular and contrary to Defendant's assertions otherwise, those counts both identify what harm (or damages) have been suffered by the Plaintiffs, utilize the correct subjective bad faith (or willful blindness) standard under 17 U.S.C. § 512(f) ("Section 512(f)"), and seek various forms of proper relief.

Sixth, Russo is voluntarily dismissing Count III for defamation. If the Court requires that Plaintiffs amend their complaint in response to the Motion, the amended pleading will not contain Count III. If the Court does not require any amendments of the FAC, Plaintiffs will coordinate with Defendant concerning the filing of an amended pleading omitting Count III. Thus, any issues raised concerning Count III are moot. Plaintiffs, however, note that the animus reflected by Melendez's outrageous statements about the Plaintiffs is further illustrative of his bad faith under Section 512(f).

**3. ARGUMENT.**

The Motion is a classic example of a movant wrongly throwing everything against the wall and hoping something sticks. See, e.g., Buitrago v. U.S., 2016 WL 4366486, at *3 (S.D. Fla. Aug. 16, 2016) (it is improper for a movant to throw as much "mud" against the wall with the hope that the court will determine what sticks and grant the requested relief).

As detailed below, each one of Melendez's grounds to dismiss the FAC either

fails or can be easily addressed by amendments to the FAC.

a. Melendez is subject to the personal jurisdiction of this Court.

In this case, subject matter jurisdiction is based upon Plaintiffs' claims under the Copyright Act, 17 U.S.C. § 101 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. (FAC at para. 15). Neither of these acts provides for nationwide service of process; however, FRCP 4 directs the Court to look at Alabama's long-arm statute to determine the existence of personal jurisdiction. Sculptchair, Inc. v. Century Arts, Ltd., 94 F. 3d 623, 626–27 (11th Cir. 1996); Dudnikov v Chalk & Vermilion Fine Arts, Inc., 514 F. 3d 1063 (10th Cir. 2008) (applying Colorado's long-arm statute to plaintiff's copyright claim in determining that the district court did have jurisdiction over a foreign defendant).

Under Alabama law, the Plaintiffs bear the burden of proving that the trial court has personal jurisdiction over Melendez. Ex parte McNeese Title, 82 So. 3d at 674. In considering a Rule 12(b)(2) motion to dismiss for want of personal jurisdiction under the Alabama Rules of Civil Procedure ("ARCP"), a court **must** consider as true the allegations of complaint **not controverted** by the defendant's affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir.1996) (emphasis added) and where the plaintiff's complaint and the defendant's affidavits conflict, the **court must construe all reasonable inferences in favor of the plaintiff**. Robinson, 74 F.3d at 255 (emphasis added); Wenger Tree Serv. v. Royal

Truck & Equip., Inc., 853 So. 2d 888, 894 (Ala.2002).

Alabama's long-arm jurisdiction has consistently been interpreted to extend the jurisdiction of Alabama courts to the permissible limits of due process. Ex parte DBI, Inc., 23 So. 2d at 643. The Due Process Clause of the Fourteenth Amendment permits Alabama to subject a nonresident defendant to its courts when that defendant has sufficient minimum contacts with Alabama. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The **critical question** with regard to the nonresident defendant's contacts with the forum state is whether the contacts are such that the nonresident defendant should **reasonably anticipate** being haled into court in the forum state (i.e., Alabama). Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985) quoting World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980).

In this case, there is no doubt that Melendez's intentional actions, notably not those of some third party, were squarely, purposefully, and intentionally directed at TSN Corp. and Egar, whom Melendez knew were residents of Alabama. His actions also caused economic and reputational harm in Alabama, as he should have reasonably anticipated. Accordingly, he should have reasonably anticipated facing suit in an Alabama court to account for his actions.

Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. In this case, this Court has specific personal

jurisdiction over Melendez. Specific contacts, which give rise to specific jurisdiction, consist of the defendant's contacts with the forum state that are related to the cause of action. Burger King Corp., 471 U.S. at 472–75.

Under Alabama law, Plaintiffs must demonstrate a firm nexus between the acts complained of and the consequences of those acts**.** Duke v. Young, 496 So.2d 37, 39 (Ala. 1986). Put another way, the nexus between Melendez and Alabama needed for specific personal jurisdiction to exist must come about by actions that he purposefully directed toward Alabama, which is exactly what happened here. Notably, a physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident. Sieber v. Campbell, 810 So. 2d 641, 644 (Ala. 2001).

The Alabama Supreme Court has developed a three (3) part test to determine whether specific jurisdiction exists over a defendant. Under that test, personal jurisdiction exists because: (1) that Melendez's contacts must be related to the cause(s) of action and/or have given rise to them (they are); (2) by his contacts Melendez, has purposefully availed himself of the privilege of conducting business in the forum state (he did); and (3) that Melendez's contacts with Alabama are such that he should reasonably anticipate being haled into court in the forum state (he should have).

**First,** the contacts with Alabama that Melendez created relate to, and directly give rise to, Egar's and TSN Corp.'s claims under the Copyright Act. As alleged in

the FAC, there is no doubt that the multiple bad faith Takedown Notices filed by Melendez form the central basis for Counts I and II of the FAC. (FAC at paras. 28-82). Specifically, the FAC alleges that:

- Each one of the Takedown Notices submitted by Melendez resulted in an automatic, unappealable, 10-14 day removal of Plaintiffs' content from YouTube. (Id. at para. 8).

- These bad faith Takedown Notices have caused the systematic, automatic, and unjustified removal of content from YouTube, causing Plaintiffs financial, reputational, and other harm. (Id.)

- Melendez refused to cease submitting Takedown Notices after Plaintiffs requested that he do so. (Id. at para. 9).

But for his actions, namely the submission of twenty-seven (27) Takedown Notices, YouTube would not have removed the content in question. None of these facts are in controversy or disputed by Melendez in his Declaration in support of the Motion (the "Melendez Dec.").

Simply put, there could not be a clearer, more concrete nexus between Melendez's actions which were felt in Alabama and the causes of action in Counts I and II of the FAC.[1] This is not a situation where some random or fortuitous action

[1] Personal jurisdiction exists when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 243 (5th Cir.

by a third party created personal jurisdiction over Melendez; **his own actions did**. Finally, importantly, none of the above factual allegations are disputed by the Melendez Dec. and thus must be accepted as true by the Court.

**Second,** by directing his bad-faith DMCA Takedown Notices at Alabama residents, he purposefully availed himself of activities in Alabama, or at a minimum, knew the consequences of his actions would be felt in Alabama by Alabama residents. As discussed below, it is uncontroverted that Melendez knew TSN Corp. and Shuli resided in Alabama at the time he submitted the Takedown Notices.

For example:

- In 2023, he admitted that he had knowledge that Egar resided in Alabama. (Id. at para. 17; see also Melendez Dec. at para. 10).
- Called Egar a "loser" who lives in bum f*ck Alabama. (Id. at para. 18.
- When speaking directly to Egar, state "who the f*ck" desires to be **in** Alabama. (Id. at para. 19).
- Melendez's YouTube channel is broadcast nationwide, and indeed worldwide, and thus was and is viewable to Alabama residents. (Id. at para. 2-3)

**Third,** and as noted by the Supreme Court, the critical question with regard to Melendez's contacts with Alabama is whether he should have anticipated being sued in Alabama based upon his actions. The answer to that question is a resounding

2008).

**yes**. Nothing in the Melendez Dec. controverts any of the facts discussed above, or in the FAC, that support the Court finding personal jurisdiction over Melendez.

To be brief, where Melendez was located when he submitted the Takedown Notices, the fact that he does not own property in Alabama, or did not produce a video specifically for Alabama, does not preclude this Court's exercise of personal jurisdiction over Melendez, as his physical presence is not required to support personal jurisdiction. Sieber, 810 So. 2d at 644[2]; and he should reasonably have anticipated being "haled" into this Court as a result of his own actions. Despite his arguments otherwise, the Melendez Dec. does not materially address whether the Court has specific personal jurisdiction over him. To the extent it does, the Melendez Dec. supports this Court exercising personal jurisdiction because Melendez knew that some of the targets of his crusade were Alabama residents.

This question essentially comes down to both a foreseeability analysis and

---

[2] As stated by the Supreme Court

> [Personal jurisdiction] may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

Burger King, 471 U.S. 476.

whether or not forcing Melendez to defend this suit in Alabama would comport with the traditional notions of fair play and substantial justice. Burger King, 471 U.S. at 476. It was absolutely foreseeable that Melendez would be, or could be, sued in Alabama after he directed multiple Takedown Notices that he knew would cause harm to Alabama residents.

There are exemplary cases that support the finding of specific personal jurisdiction over Melendez in this matter.

The Supreme Court case of Calder v. Jones provides some insight as to the limits of specific jurisdiction. In Calder, Shirley Jones, of Partridge Family fame, brought suit in California against the National Enquirer, the Enquirer's local distributor, and the writer and editor of an allegedly libelous article published in the Enquirer. Calder v. Jones, 465 U.S. 783, 785-86 (1984). While the Enquirer and its distributor chose not to contest jurisdiction, both the writer, John South, and the editor, Iain Calder, challenged the authority of the California courts to hear Jones's suit, stressing that the article was written and edited in Florida and, though the Enquirer was distributed nationally, the individual defendants had few contacts with California. Id. at 785–86, 789. The Supreme Court found specific jurisdiction in California was nonetheless appropriate because the defendants had not engaged in "mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were **expressly aimed** at California." Id. at 789 (emphasis added). The

Supreme Court added that Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works, California. Id. at 789–90. Accordingly, personal jurisdiction in California was justified. Put another way, the defendant should have foreseen that it could have been brought into a California court.

The Tenth Circuit Court of Appeals, in a Copyright Act case, Dudnikov v. Chalk & Vermillion Fine Arts, Inc., held that the defendant's submission of a copyright infringement notice to the online platform eBay.com was sufficient to confer personal jurisdiction over the defendant in Colorado. Dudnikov v. Chalk & Vermillion Fine Arts, Inc., 514 F. 3d 1063, 1082 (10th Cir. 2008) (reversing the trial court's ruling that it did not have personal jurisdiction over the defendant)[3]. The same rationale applies here. The Tenth Circuit summed up the facts, and the case, as follows:

> Defendants sent a NOCI to eBay expressly intending (and effectually acting) to suspend plaintiffs' auction in Colorado. Plaintiffs' suit arises from, and is indeed an effort to reverse, the intended consequences of defendants' NOCI which they incurred in Colorado. For purposes of this motion, moreover, we must assume defendants knew plaintiffs' business was located in Colorado. And defendants point to no basis in traditional notions of fair play or substantial justice that would preclude suit in that forum. Accordingly, the judgment of the district court is

[3] Notably, Colorado's long-arm statute is construed similarly to Alabama's in that it confers the maximum jurisdiction permissible consistent with the Due Process Clause. Archangel Diamond Corp. v. Lukoil, 123 P.3d 1187, 1193 (Colo.2005).

> reversed, and this case is remanded for further proceedings not inconsistent with this opinion.

Id.

Further, the District Court of Massachusetts, in Tuteur v. Crosley-Corcoran, a Section 512(f) case, expressly held that when an out-of-state party submits an allegedly bad faith DMCA Takedown Notice that is directed towards content posted by a Massachusetts resident, specific personal jurisdiction is present over the out-of-state party. Tuteur v. Crosley-Corcoran, 961 F. Supp. 2d 333, 339-340 (D. Mass. 2013).

Melendez's actions in this case essentially mirror those of the defendants in Calder, Tuteur, and Dudnikov – this Court has personal jurisdiction over Melendez.

In addition to minimum contacts, the exercise of jurisdiction must also comport with traditional notions of fair play and substantial justice. Burger King, 471 U.S. at 476. In this analysis, courts often look to the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. Id. at 477. None of the factors above favor Melendez. It is no more onerous on Melendez to litigate this matter in Alabama than it would be to force Alabama residents TSN Corp. and Egar to litigate this matter in Florida. Accordingly, there is **no** evidence

explaining why litigating in Alabama would be especially onerous on Melendez, much less how any such inconvenience achieves a "constitutional magnitude." Id. at 484. Additionally, Alabama has a "manifest interest" in providing its residents with a convenient forum to redress their injuries. See Burger King, 471 U.S. 473; Ex parte DBI, Inc., 23 So. 3d at 656 (a plaintiff's harm suffered in Alabama creates the State of Alabama's manifest interest in establishing personal jurisdiction over the defendant).

The law is clear that there is no burden imposed on Melendez by being required to litigate in Alabama. The Supreme Court noted in World–Wide Volkswagen that the limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. 444 U.S. at 292. The Court then stated, "As we noted in McGee v. International Life Ins. Co., supra, 355 U.S. at 222–223, this trend is largely attributable to a fundamental transformation in the American economy." 444 U.S. at 292–93. The Court then quoted the portion of McGee, written in 1957, recognizing that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." 444 U.S. at 293. In this case, there is no greater burden on Melendez to answer for his actions in Alabama than there is on the Alabama residents being forced to prosecute this case in Florida.

Simply put, the Court's exercise of personal jurisdiction over Melendez is proper because he knew, or should have known, that his conduct would harm residents of Alabama. Finally, his actions make it foreseeable that he reasonably should have anticipated being hauled into court in Alabama. Finally, the exercise of jurisdiction in this case comports with traditional notions of fair play and substantial justice. For at least these reasons, the portion of the motion related to FRCP Rule 12(b)(2) should be denied. Madara v. Hall, 916 F.2d 1510, 1516 (11th Cir. 1990) (all that due process requires is that a defendant have fair warning that a particular activity may subject him to the jurisdiction of a foreign sovereign," and that the "fair warning requirement is satisfied if the defendant has 'purposefully directed' his activities at the forum," and the injuries in question arise from or relate to the defendant's activities that were aimed at the forum state).

b. Venue is Proper in the Northern District of Alabama.

Melendez next attacks the FAC on the grounds that venue here in the Northern District is improper pursuant to Rule 12(b)(3). Again, this argument fails. Initially, Plaintiffs note that they need only present a *prima facie* showing that their chosen forum constitutes a proper venue. Home Ins. Co. v. Thomas Indus., Inc., 896 F.2d 1352, 1355 (11th Cir. 1990). Further, the facts as alleged in the complaint are taken as true to the extent they are uncontroverted by the defendant's affidavits. Home Ins., 896 F. 2d at 1355

*1. Venue is proper under 28 U.S.C. § 1400(a) as Melendez is "found" in this district.*

In copyright cases, venue is proper in any judicial district where the defendant "may be found"—that is, any district where the defendant is subject to personal jurisdiction. 28 U.S.C. § 1400(a); Palmer v. Braun, 376 F.3d 1254, 1259 (11th Cir. 2004). Melendez admits this.

As discussed extensively above, this Court has personal jurisdiction over Melendez; thus, under § 1400(a), venue is proper in this district.

*2. Venue is likewise proper under 28 U.S.C. §1391(b)(2).*

Melendez next challenges venue under 28 U.S.C. §1391(b)(2). This attack fails, as this district is a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." When venue is challenged, the court must determine whether the case falls within one of the three categories set out in 28 U.S.C. § 1391(b). Doster Constr. Co., Inc. v. Expert Climate Control, LLC, 2026 WL 1534491, at * 6 (N.D. Ala. June 1, 2026). If it does, venue is proper; then a case cannot be dismissed under Rule 12(b)(3) of the FRCP. Finally, the plaintiffs' choice of forum should not be disturbed unless it is clearly outweighed by other considerations." Howell v. Tanner, 650 F.2d 610, 616 (5th Cir. 1981).

Under § 1391(b)(2), when evaluating where a substantial part of the events or

omissions giving rise to a claim occurred, the Eleventh Circuit has made clear that only those acts and omissions having a close nexus to the wrong are properly weighed in the substantial part analysis. Morgan v. N. MS Med. Ctr., Inc., 403 F. Supp. 2d 1115, 1123 (S.D. Ala. 2005). In fact, under § 1391, plaintiffs do not have to select the venue with the most substantial nexus to the dispute, as long as they choose a venue where a substantial part of the events giving rise to the claim occurred. Id. at 1122 (finding Alabama a proper venue under § 1391(b)(2) because the plaintiff relied heavily on Alabama events to prove his claim, even though part of the events occurred in Mississippi).

In the case at hand, a substantial nexus exists to the Northern District of Alabama as the damage, both economic and reputational, occurred in this district. See, e.g., Carden v. Springfield Mortuary Service, Inc., 2024 WL 4031448, at *5 (N.D. Ala. Sept. 3, 2024) (analyzing where the damages occurred or were suffered in determining that venue was proper in the Northern District of Alabama). In this case, the FAC alleges that a substantial part of the damages claimed occurred in this district. (FAC at para. 24; see also TSN Dec. at paras. 4-8). Mobile Diagnostic Imaging, Inc. v. Gormezano, 2012 WL 3244664, at *2 (S.D. Fla. Aug. 9, 2012) (referencing cases holding that substantial events occurred within a venue when harm or injury was suffered in that venue).

Put another way, since Plaintiffs were harmed in Alabama, venue is proper

under §1391(b)(2), and the portion of the Motion seeking a dismissal under Rule 12(b)(3) is due to be denied. Exist Inc. v. Starr Indem. & Liab. Co., 2023 WL 11969904 at *3 (S.D. Fla. Nov. 2, 2023) (venue for suit challenging New York-based insurer's denial of claim was proper in Florida because "one of the losses giving rise to" the claim occurred there); AutoNation, Inc. v. Hall, 2019 WL 3712008, at *8 (S.D. Fla. May 29, 2019) (stating that courts have "held that substantial events occurred within a venue when harm or injury was suffered in that venue").

*3. There are no grounds to transfer this action under either 28 U.S.C. §§ 1406(a) or 1404(a).*

Melendez also asks the Court to transfer this action to the Middle District of Florida. (Motion, pp. 11-12). That request should be denied.

First, as set forth above in Sections 3(b) (1 and 2), venue is proper under both §§ 1391(b)(2) and 1400(a) in this district. Therefore, there are no grounds under § 1406(a) to transfer this case, as that statute only allows transfer of a case if it is originally filed in the wrong venue. Doster Constr. Co., Inc. 2026 WL 1534491, at *7 (because the Court may exercise jurisdiction over the defendants, § 1406 does not provide a basis for transferring this case to another district). This matter **was not** filed in the wrong venue; accordingly, § 1406(a) is inapplicable.

Second, there are not sufficient grounds to transfer venue in this case pursuant

to § 1404(a) either. That statute provides that for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. 28 U.S.C. § 1404(a). Here, the parties have not consented to a particular venue. Therefore, the Court must consider the following factors to determine whether to transfer this case: the relative ease of access to sources of proof; availability of compulsory process for attendance of witnesses, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, n. 6 (1981). Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law. Piper Aircraft Co., 454 U.S. at 241, n. 6; Doster Constr. Co., Inc. 2026 WL 1534491, at *6.

The Court also must give weight to the plaintiffs' choice of forum. See Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955); Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 62 n.6 (2013). The Court must weigh the relevant factors and decide whether, on balance, a transfer would serve the convenience of parties and witnesses and otherwise promote the interest of justice.

This District is the most convenient for the parties. Two (2) of the plaintiffs reside or are based here (FAC at para. 112), and their records, books, and other evidence (such as video recordings) are here in this district. (TSN Dec. at paras. 6-8). Russo is willing to travel to this district as needed to participate in this case. That only leaves Melendez objecting to venue here. His objections do not warrant transfer. With today's technology, depositions can occur virtually, giving Melendez the option of avoiding travel to this district. The attorneys can manage the paper discovery for the case electronically, minimizing or obviating inconvenience related to that work. It would be at least as inconvenient for TSN Corp. and Egar to travel to the Middle District of Florida as it will be for Melendez to travel to this district. Put another way, a transfer only benefits Melendez.

Finally, the Court also must weigh the Plaintiffs' choice of forum.[4]

On balance, transfer will not serve the convenience of parties, witnesses, or otherwise promote the interests of justice, and thus Melendez's request for transfer should be denied.

c. <u>There are no grounds to strike the Defendant's own statements from the FAC.</u>

The Motion asks the Court to strike certain allegations in paras. 17-19 of the

[4] This issue is discussed extensively below, but Melendez, if he had a true belief that his intellectual property rights were being infringed, could have chosen to file an infringement suit in the Middle District of Florida. He did not, rather he chose to harass the plaintiffs using the DMCA.

FAC. That portion of the Motion should be denied as well.

The allegations in question are:

> 17. On July 29, 2023, during his public broadcast, Defendant directly communicated to Egar in Alabama a threat of litigation, violence, and/or property seizure in Alabama: "You got a nice house in Alabama. You want to keep it?" (Exhibit 4 at 0:07).
>
> 18. On August 1, 2023, Defendant directed communications via his public broadcast to Egar in what Melendez calls "bum f*ck Alabama." He stated: the only person that cared that the Dues Payer was leaving the [Howard] Stern Show was the Dues Payer's wife because now she's stuck in a f*cking house in bum f*ck Alabama with that f*cking loser. LOSER! (Exhibit 4, at 0:29).
>
> 19. On March 13, 2024, Melendez communicated directly to Egar in Alabama, adding Defendant's opinions about people who live in Alabama:
>
> And by the way, you're in Ala-F*cking-Bama. Who the f*ck desires to be in Alabama? Jesus.

(Id. at 1:18).

Melendez mistakenly concludes, or asks the Court to conclude, that those allegations are included to support a defamation claim (i.e., Count III, which is being dismissed); they are not. Rather, those allegations are directly related to Melendez's knowledge that he was directing what Plaintiffs allege is wrongful and bad faith conduct at Alabama residents Egar and TSN Corp. These particular allegations form no basis for the defamation claim in Count III of the FAC. Accordingly, Melendez's entire argument as to why those allegations should be stricken is premised upon either a misunderstanding of why they are included in the FAC, or is an attempt to obfuscate the fact that his own statements provide grounds for the Court exercising

personal jurisdiction over him.

However, even if the Court does entertain striking paras. 17-19 of the FAC, it should not do so. Striking a pleading, or a portion of a pleading, is a severe remedy with courts consistently expressing reluctance to employ such an extreme measure. Indeed, motions to strike will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties. Harty v. SRA/Palm Trails Plaza, LLC, 755 F. Supp. 2d 1215, 1218 (S.D. Fla. 2010); Poston v. Am. President Lines Ltd., 452 F. Supp. 568, 570 (S.D. Fla. 1978) (motions to strike on the grounds of insufficiency, immateriality, irrelevancy and redundancy are not favored, often being considered "time wasters"); Starship 1 LLC v. Sky Support LLC, 2023 WL 5231807, at *2 (S.D. Fla. June 14, 2023) ("Indeed, Rule 12(f) motions to strike are regularly denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.").

In this case, the allegations in question are not frivolous, do not prejudice Melendez, and are clearly tied to the subject matter in controversy in at least two (2) ways.

For starters, paras. 17-19 are not frivolous and are tied to the subject matter of the case. Melendez has challenged this Court's personal jurisdiction over him. One

of the key, if not the key, questions in deciding whether personal jurisdiction exists in this case is whether it was foreseeable to Melendez that he could be sued in Alabama. The factual allegations (which Melendez does not dispute the veracity of) are directly related to the actions that Plaintiffs allege establish personal jurisdiction over Melendez.

Additionally, these allegations further establish Melendez's extreme disdain and overall attitude against and towards Plaintiffs. The language used by Melendez was his own – the vulgarity of his own statements, and the animus evidenced thereby, relate to the bad faith nature of the Takedown Notices he filed with YouTube. Plaintiffs respectfully suggest that his animus towards them, as evidenced by his own vulgar public statements, supports their claims under Section 512(f) (which are discussed in more detail below). It is true that these statements alone may not establish the bad faith nature of the Takedown Notices submitted by Melendez; they can, and should, be considered when viewing the totality of the circumstances around Melendez's decision to submit twenty-seven (27) Takedown Notices to harass and harm the Plaintiffs. Simply put, the allegations in paras. 17-19 of the FAC should not be stricken because they are not frivolous and are tied to the subject matter of the FAC.

Finally, paras. 17-19 should not be stricken because they do not prejudice Melendez. These statements are attributed to Melendez in paras. 17-19, which,

again, he does not dispute making, were not made in private and are not being made public for the first time in the FAC. The Motion conveniently omits the fact (that is properly alleged in the FAC) that Melendez made these statements on his own YouTube show. He cannot reasonably claim to be prejudiced by his own words and statements. If he is now embarrassed by, or feels that his own words will be detrimental to his defense in some unidentified manner, those are concerns he should have considered before making the statements.

There are no grounds to strike the allegations in paras. 17-19 of the FAC, and the Motion's request to do so is a classic example of the time-wasting nature of motions to strike. Platte Anchor Bolt, Inc v. IHI, Inc., 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (if there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion to strike).

d. The First Amended Complaint is not a shotgun pleading.

Melendez next attacks the FAC on the grounds that it is a shotgun pleading. Plaintiffs respectfully disagree. Rule 8(a)(2) only requires a short and plain statement of the claim showing that the pleader is entitled to relief, to give fair notice of what the claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957). The FAC satisfies that standard.

The Eleventh Circuit has noted that

> Pleading is pure statement; just as much as a letter addressed to your sweetheart or your wife or your friend. The plaintiff complains that he

> has such a case, and he tells you what it is. The defendant says either that is not so, or something else is so, and he makes his statement. The true rule ought to be this: the statement ought to consist precisely of what has to be [proven]. It ought not to fall short, or go beyond. If it goes beyond, it has surplusage matter that is unnecessary. Whatever is irrelevant, whatever is non-essential in statement, ought not to be in. Let the law declare that every man's pleadings shall embrace a full and clear statement of all matters of fact, which he is required to [prove], and no other.

Weiland, 792 F. 3d at 1320.

Shotgun pleadings fail to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests. Id. at 1323. The FAC properly gives notice that the Plaintiffs have a case, and tells Defendant what it is. Melendez's argument that he cannot answer the FAC because it is confusing or burdensome falls flat. The FAC is sufficient to allow Melendez to say "either that is not so, or something else is so."

For example, Counts I and II are closely interrelated. They both relate to Melendez's actions in submitting the Takedown Notices and, as required as grounds for submitting the Takedown Notices to YouTube, Melendez's claims of copyright infringement.

Even if the Court determines that the FAC is a shotgun pleading, which it should not, before dismissal on those grounds, the Court must first explain how the pleading violates the shotgun pleading rule and give the Plaintiffs at least one opportunity to re-plead. Magluta v. Samples, 256 F. 3d 1282, 1284 (11th Cir. 2001)

(vacating the lower court when it did not provide plaintiff a chance to amend and replead a complaint designated as a shotgun pleading); see also Vibe Micro, Inc. v. Shabnets, 878 F. 3d 1291, 1296 (11th Cir. 2018) (a district court must sua sponte give a claimant one chance to replead before dismissing a case with prejudice on non-merits shotgun pleading grounds). In the instant case, should the Court determine the FAC is a shotgun pleading, Plaintiffs will move quickly to amend, to identify which factual allegations in the FAC are specific to each count and which one of the Plaintiffs (or combination thereof) is asserting each count against Melendez.

e. Plaintiffs have sufficiently pled their DMCA and Copyright Act claims.

The Motion then turns to its first attack on the merits of the FAC and argues that Counts I and II of the FAC are not sufficiently pleaded and therefore should be dismissed. Melendez's arguments fail as set forth below.

The threshold for surviving a motion to dismiss for failure to state a claim is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A motion to dismiss should not be granted unless the claimant fails to plead enough facts to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Generally, to survive a motion to dismiss, a complaint need not contain detailed factual allegations but rather only enough facts to state a claim to relief that is

plausible on its face. Maledy v. City of Enterprise, 2012 WL 1028176, at *1 (M.D. Ala. Mar. 26, 2012). Specific facts are not necessary; the statement needs only to give the defendant fair notice of what the claim is and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (2007). Most importantly, when reviewing a motion to dismiss, the Court must accept the well-pled facts as true and view them in the light most favorable to Plaintiffs. St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 954 (11th Cir. 1986); see also 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed.) (all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader). Further:

> [a] complaint [should not] be dismissed merely because the district court believes that the case is legally or factually doubtful or that it is unlikely that the plaintiff will prevail in the action on the merits. Whether the plaintiff ultimately can prevail on the merits is a matter properly determined on the basis of proof, which means on a summary judgment motion or at trial by the judge or a jury, and not merely on the face of the pleadings. Likewise, courts have refused to consider presumptions in favor of the defendant on a motion to dismiss since presumptions are evidentiary standards that are inappropriate for evaluation at the pleadings stage. The district court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or even extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.

5B Fed. Prac. & Proc. Civ. § 1357 (4th ed.)

Ultimately, Defendant bears the burden to prove that no legally cognizable claim exists – this is a burden he does not carry. Branch Banking and Trust Co. v. Howard, 2013 WL172903, at *1 (S.D. Ala. Jan. 16, 2023).

*1. Count I is properly pleaded.*

Count I of the FAC alleges that Melendez violated Section 512(f) by submitting at least twenty-seven (27) bad-faith Takedown Notices to YouTube. (See, e.g., FAC at paras. 7, 37-82). This Count is properly pleaded, and the Court should deny Melendez's hail-mary attempt to have it dismissed. Plaintiffs believe that some background may assist the Court in reaching the proper ruling regarding this Count.

i. General Introduction to the DMCA.

Effective in 1998, the DMCA added new sections to the existing Copyright Act. The DMCA's purpose was to "strengthen copyright protection in the digital age." Universal City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001). Only one provision of the DMCA is at issue here: the Online Copyright Infringement Liability Limitation Act, now codified in 17 U.S.C. § 512. Sections 512(c), (f), and (g) are at the heart of this case.

Section 512(c) permits service providers, e.g., YouTube, to avoid copyright infringement liability for storing users' content if—among other requirements—the service provider "expeditiously" removes or disables access to the content after receiving notification from a copyright holder that the content is infringing. 17 U.S.C. § 512(c). Section 512(c)(3)(A) sets forth the elements that such a "takedown notification" must contain. These elements include identification of the copyrighted work, identification of the allegedly infringing material, and, **critically, a statement**

**that the copyright holder believes in good faith the infringing material is not authorized by the copyright owner, its agent, or the law**. The procedures outlined in § 512(c) are often referred to as the DMCA's "takedown procedures."

To avoid liability for disabling or removing content, the service provider must notify the user of the takedown. § 512(g). The user then has the option of restoring the content by sending a counter-notification, which must include a statement of good faith belief that the material was removed or disabled as a result of mistake or misidentification. Upon receipt of a valid counter-notification, the service provider must inform the copyright holder of the counter-notification and restore the content within not less than 10, nor more than 14, business days, unless the service provider receives notice that the copyright holder has filed a lawsuit against the user seeking to restrain the user's infringing behavior. Id. The procedures outlined in § 512(g) are often referred to as the DMCA's "put-back procedures."

If someone abuses the DMCA, they may be subject to liability under § 512(f). That section provides: "Any person who knowingly materially misrepresents under this section—(1) that material or activity is infringing …." § 512(f). The term "knowingly" under § 512(f) means that a party actually knew, should have known if he acted with reasonable care or diligence, or would have had no substantial doubt had he been acting in good faith, that it was making misrepresentations. Johnson v. New Destiny Christian Ctr. Church, Inc., 2017 WL 3682357 at *3 (M.D. Fla. Aug.

25, 2017). Subsection (1) applies to copyright holders, such as Melendez.

To be clear, if a copyright holder ignores or neglects to consider fair use under the Copyright Act before sending a Takedown Notice, they are liable for damages under § 512(f). Lenz v. Universal Music Corp., 815 F.3d 1145, 1154 (9th Cir. 2016); accord Disney Enter., Inc. v. Hotfile Corp., 2013 WL 6336286, at *48 (S.D. Fla. Sept. 20, 2013). A copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to Section 512(f) liability. Disney Enter., Inc. 2013 WL 6336286, at *48 (S.D.Fla. Sept. 20, 2013) (denying summary judgment of § 512(f) counterclaim due to "sufficient evidence in the record to suggest that Warner intentionally targeted files it knew it had no right to remove"); Rosen v. Hosting Servs., Inc., 771 F. Supp. 2d 1219, 1223 (C.D. Cal.2010) (denying summary judgment of § 512(f) counterclaim where the takedown notification listed four URL links that did not contain content matching the description of the purportedly infringed material); Online Policy Grp. v. Diebold, Inc., 337 F. Supp.2d 1195, 1204–05 (N.D.Cal.2004) ("[T]here is no genuine issue of fact that Diebold knew—and indeed that it specifically intended—that its letters to OPG and Swarthmore would result in prevention of publication of that content.... The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not

copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.”).

ii. Meledez violated the DMCA.

Put succinctly, to survive Melendez’s bid to dismiss it, Count I under Section 512(f), Plaintiffs allege (and eventually show) that (1) Melendez knowingly and materially misrepresented that copyright infringement occurred; (2) that YouTube relied on that misrepresentation to remove or disable access to the material claimed to be infringing; and (3) Plaintiffs were injured. Mishiyev v. UMG Recordings, Inc, 2025 WL 2624425, at *2 (M.D. Fla. Sept. 11, 2025). The FAC contains every one of those allegations, which are well supported by factual allegations.

For example, the FAC alleges that Melendez knowingly and materially misrepresented that Plaintiffs were infringing upon his copyright rights. (See FAC at paras. 7, 31, 37-60). The FAC contains detailed allegations (rather than “bare bones” allegations) as to why Melendez Takedown Notices were knowingly and materially misrepresentations to YouTube. In fact, the FAC summarizes the well-pleaded facts establishing Melendez’s knowing and material misrepresentations in this case.

The FAC details Melendez’s “education” on the concept of fair use under the Copyright Act and his knowledge that the very acts he claims are copyright infringement are allowed under the fair use doctrine. Specifically, in just a sampling

of the allegations in the FAC, Melendez admitted the following:

> 39. On September 14, 2023, Melendez admitted that he learned (in 2023) **that fair use means others can play his video clips without violating the law:**
>
> they [another podcaster] did a whole show playing [Melendez's material]. And I didn't like I never I didn't get the term fair use, you know? I didn't understand it. **So, I don't think they were allowed to play it and all that. I was wrong.**
>
> (Exhibit 6 at 0:06-0:20).
>
> …
>
> 40. On September 15, 2023, during a public broadcast, Melendez **admitted that he was wrong when he thought others could not play clips of his show, and that he has come to understand that such use is fair use.** He stated:
>
> I didn't know that you're allowed to do that. So, I Yeah. Was I wrong? Yeah. But I didn't know that you're allowed to do that thing. How do you know? No. And then my producer Royce was like, "No, John, I did a whole essay on **fair use and they are allowed to do it**." And we argued, but **he was right. I was wrong**.
>
> (*Id.* at 0:23-0:42).
>
> …
>
> 41. On November 5, 2023, Melendez admitted during a public broadcast that his producer "schooled him" to understand that **others "could…play clips of [my] show" because of "fair use":**
>
> The only thing I did was I complained to Royce, my producer. How could he play clips of the show? This can't be allowed. **And Royce would school me. John, it's called fair use**.
>
> (*Id.* at 0:46-0:55).
>
> …
>
> 43. On December 9, 2023, Melendez admitted during a public broadcast that Melendez was "foolish enough to not understand fair use," but that when Producer Royce "finally got it through [Melendez's] thick skull," Melendez then (in 2023) understood that fair use allows other podcasters to play clips of Melendez's show.

> I was **foolish enough to not understand fair use**. I'm not a lawyer. And when it comes to legalese, I'm not, you know, no, **I didn't understand fair use**. Royce did. He tried to explain it to me and when he **finally got it through my thick skull, I understood.**
>
> (*Id.* at 1:27-1:46).

(FAC at paras. 39-41, 43; see also FAC at paras. 48-50).

The FAC also clearly and unmistakably alleges that the fair use doctrine allows Melendez to play other YouTube creators' content pursuant to the fair use doctrine. (FAC at paras. 46-48). Yet as alleged in the FAC, Melendez specifically targeted *The Shuli Network* for anticompetitive reasons while ignoring others that posted similar content.

Melendez clearly now understands the fair use doctrine, or at least he purports to. Yet, despite that knowledge, he filed twenty-seven (27) Takedown Notices against content on *The Shuli Network* claiming infringement and, under the penalty of perjury, he affirmed that the fair use doctrine did not authorize all of the content he requested to be taken down. The simple fact that he filed so many Takedown Notices in a relatively short period of time and never followed up any of those Takedown Notices with a lawsuit claiming copyright infringement weighs heavily against Melendez's alleged good faith belief that his notices were legitimate. See Alper Auto. v. Day To Day Imports, 2022 WL 3418643, *2 (11th Cir. Aug. 17, 2022) (the 11th Circuit draws an adverse inference from a Defendant's failure to initiate litigation against Plaintiff after submitting Takedown Notices); Online Policy

Group., 337 F. Supp. 2d 1204-1205 (failing to file an infringement suit against alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property).

The FAC contains sufficient allegations that satisfy the first element of this claim, that is, a knowing misrepresentation by Melendez or whether he was wilfully blind. See Lenz v. Universal Music Corp., 815 F.3d 1145, 1155 (9th Cir. 2016) (Willful blindness under § 512(f) requires two elements: (1) the defendant subjectively believed there was a high probability that the material constituted (or did not constitute) fair use, and (2) the defendant took deliberate actions to avoid confirming that fact).

The allegations discussed above sufficiently allege actual knowledge or willful blindness in that Melendez is alleged to have known, based upon his education and knowledge of the law of fair use, that his Takedown Notices were false and misleading, or he was willfully blind in that he surely subjectively knew the Takedown Notices targeted materials allowed under the fair use doctrine and deliberately ignored that fact.

Finally, although the FAC provides more than enough factual allegations to support the first element of the Section 512(f) claim, Melendez's knowledge of his

misrepresentations can be alleged generally. See FRCP 9(b). In this case, the FAC contains many examples of more general allegations of Melendez's bad faith and knowledge.

The Plaintiffs have also properly alleged that YouTube relied upon the bad faith Takedown Notices submitted by Melendez to remove their content. (See FAC at paras. 30-35, 100). For example, in para. 100, it is alleged that "Defendant's material misrepresentations caused YouTube to repeatedly remove or disable access to Plaintiffs' non-infringing content, resulting in unwarranted takedowns that could not be adequately remedied through counter-notification given the time-sensitive and expressive nature of the content." These allegations sufficiently allege that YouTube relied on Melendez's misrepresentation to remove or disable access to the material claimed to be infringing.

Finally, the FAC alleges that Melendez's actions caused harm. (See FAC at paras. 21, 101). In short, Count I is properly pleaded. See, e.g., Makeup Blowout Sale Group, Inc. v. All that Glowz, Inc., 2020 WL 5535533 (S.D. Fla. Sept. 15, 2020) (disputed allegations concerning defendant's good faith in submitting numerous notices under Section 512(f) must be accepted as true when ruling upon a motion to dismiss, and when accepted as true, properly pleaded that claim).

Melendez spends a considerable amount of time arguing that the FAC's allegations that Melendez "knew or should have known" about the falsity of his

repeated Takedown Notices; Melendez misses the point.

As addressed above, Melendez's alleged knowledge of, or belief about, what is, or isn't, fair use when viewed in light of the repeated Takedown Notices, creates a question of fact that cannot be determined at this stage, as to whether he formed the required beliefs that his rights were being infringed, or as alleged in the FAC, that the Takedown Notices were filed with the anticompetitive intent to harm or harass a competitor. See MM Games d.o.o. v. Reblo Soares, 2026 WL 529638 (C.D. Cal. Feb. 202, 2026) (allegations that DMCA takedown notices were filed to economically harm a competitor or harass the competitor sufficient to survive a motion to dismiss).

The passage of time between Melendez's "education" on the fair use doctrine and his submission of bad faith Takedown Notices is immaterial. To the extent it is material, surely Melendez's understanding of the doctrine would have only grown over time – yet – he stated, twenty-seven (27) times, that the doctrine did not protect Plaintiffs' content as satire, parody, transformative, etc.

Additionally, as recognized by the Eleventh Circuit, his failure to file a single copyright infringement lawsuit also creates an adverse inference, at least at this stage, concerning his good faith belief and the knowledge of the falsity of these representations to YouTube. The use of the phrase "knew or should have known" in the FAC is not meant to imply a negligence standard applies in this case; rather, it

means, and should be read in context with the rest of the FAC, that Melendez was willfully blind or, in the alternative, intentionally sought to harm Plaintiffs, in submitting the repeated Takedown Notices to YouTube. Alper Automotive, 2022 WL 3418643, at *3 (affirming a willful blindness standard can be applied to judge whether a representation related to a DMCA Takedown Notice was known to be false). The FAC does not create, nor rely upon, an "objective standard." There are ample allegations that Melendez either subjectively knew, or was willfully blind to, the fact that his Takedown Notices were material and knowing misrepresentations.[5]

In short, Count I is properly pleaded to survive a motion to dismiss under Rule 12(b)(6).

iii. Count II is properly pleaded in that it presents a justifiable controversy and requests proper relief.

The Motion's attacks on Count II fail. In particular, at least with regard to Plaintiffs Egar and/or TSN Corp., there exists a controversy as to whether or not the twenty-seven (27) YouTube broadcasts that Melendez has stated infringe his copyright rights actually infringe those rights. The FAC alleges that those videos are all allowed under the fair use doctrine as being transformative, serving purposes of

[5] The Motion's red-herring discussion of YouTube's reinstatement of the removed content contorts why the FAC includes those allegations. Specifically, if Melendez truly had a subjective (or objective, for that matter) belief that the complained-of content infringed his copyright rights, he could have and indeed should have filed a suit to enforce those rights. The fact that he failed to do so twenty-seven (27) times after the content was restored by YouTube is telling, as discussed herein.

criticism, commentary, parody, ridicule, satire, and analysis, adding new meaning, message, and expression distinct from Melendez's original videos. Melendez, via the TakeDown Notices, stated the opposite. Thus, a justiciable controversy exists.

As for the relief requested in Count II, it is premature to dismiss any of the sought relief therein. Plaintiffs have a protectable right in seeking a ruling as to whether any of the videos that Melendez submitted a Takedown Notice against actually infringed his rights – or whether, as alleged by the FAC, those videos were protected free speech under the fair use doctrine. That is the relief that is sought by para. 114 (a) of the FAC. Defendant's attempt to stretch the sought relief into some allegedly untenable and unavailable remedy is unavailing. Likewise, the relief sought in para. 114(b) of the FAC is likewise proper at this time.

Injunctions against future conduct are available under the Copyright Act. See Capitol Records, Inc. v. Thomas-Rasset, 692 F.3d 899 (8th Cir. 2012); Russian Media Grp., LLC v. Cable America, Inc., 598 F.3d 302, 307 (7th Cir.2010) (the district court is even permitted to enjoin certain otherwise lawful conduct where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment); EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 842 (6th Cir.1994) (if a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct standing alone,

would have been unassailable). The scope of any injunction that this Court may enter is to be determined; thus, at this juncture, it is premature to dismiss a request for, or limit, any relief that Plaintiffs may ultimately be entitled to.

While it may be a high hurdle for plaintiffs to clear, courts will issue injunctions against parties to prevent the party from fraudulently claiming intellectual property infringement. Similar relief is routinely sought in the patent infringement context. See, e.g., Golan v. Pingel Enterprises, Inc., 310 F.3d 1360 (Fed. Cir. 2002); Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008). It is simply improper at the motion to dismiss stage to either dismiss Count II due to the relief requested or narrow the relief that is sought.

f. Request to Amend the FAC.

The Motion argues in several places (see, e.g., Section (C)(1) and (D) (1)) that the use of the term "Plaintiffs" justifies dismissal of the FAC. While any ambiguity in the FAC should have been addressed with a Motion for a More Definite Statement under Rule 12(e), Plaintiffs respectfully request that the Court allow them to amend the FAC to address Melendez's alleged shortcomings, if necessary. Plaintiffs' request is proper, and Plaintiffs respectfully state that the amended complaint will render moot many of the issues raised by Melendez under Rule 12(b)(6) in relation to Counts I, II, and III, as they are currently pleaded to include specific identification of what individual plaintiff is asserting in each count and why.

## 4. CONCLUSION.

In conclusion, Plaintiffs respectfully oppose the Motion, and the Court should deny it in its entirety. However, should the Court be inclined to grant the Motion for any reason, Plaintiffs respectfully seek leave of Court to amend the FAC and cure any deficiencies identified by the Court. Finally, Plaintiffs respectfully request oral argument in this matter.

Date: September 4, 2026

*/s/Jeremy A. Smith*
Jeremy A. Smith (ASB-1731-J73S)
L. Franklin Corley IV (ASB-7350-73C)
Attorneys for Plaintiffs

**OF COUNSEL:**
**LANIER FORD SHAVER & PAYNE P.C.**
Post Office Box 2087 (35804)
2101 West Clinton Avenue, Suite 102
Huntsville, Alabama 35805
Telephone Number: (256) 535-1100
Facsimile Number: (256) 533-9322
Email: lfc@lanierford.com
jas@lanierford.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Gregory H. Revera
**REVERA LAW FIRM, LLC**
P.O. Box 1605
Madison, Alabama 35758
Telephone Number: (256) 217-4554
Greg@ReveraLaw.com

*/s/Jeremy A. Smith*
Jeremy A. Smith